k2b2Ros1 kjc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                         18 Cr. 802(CM)

5  RICKY ROSA,

6              Defendant.

7  ------------------------------x        Sentence

8                                         February 11, 2020
                                          5:25 p.m.
9

10 Before:

11                 HON. COLLEEN MCMAHON,

12                                         Chief Judge

13

14
                        APPEARANCES
15
   GEOFFREY S. BERMAN
16      United States Attorney for the
        Southern District of New York
17 BY:  DOMINIC A. GENTILE
        Assistant United States Attorney
18

19 EDWARD SAPONE
   CHASE RUDDY
20      Attorneys for Defendant

21

22

23

24

25

k2b2Ros1 kjc

1          (Case called)

2          THE DEPUTY CLERK:  Appearance.

3          MR. GENTILE:  Good afternoon, your Honor.  Dominic

4     Gentile for the United States.

5          THE COURT:  Good afternoon, Mr. Gentile.

6          MR. SAPONE:  And good afternoon, your Honor.  Edward

7     Sapone and, with the court's permission, my associate Chase

8     Ruddy.  We are both here for Ricky Rosa, who is seated in the

9     middle.

10          THE COURT:  Good afternoon.

11          This matter is on for sentencing under Docket No. 18

12     Cr. 802, United States of America v. Ricky Rosa, Mr. Rosa

13     having been found guilty by plea to one count of conspiracy to

14     distribute and possess with intent to distribute heroin, the

15     lesser included offense, under 21 United States Code § 846 and

16     841(b)(1)(C).  This crime carries a statutory maximum sentence

17     of 20 years' imprisonment, three years' supervised release, a

18     fine of $1 million, and a $100 special assessment.

19          In connection with today's proceedings, I have

20     received and reviewed the presentence report prepared by United

21     States Probation Officer Christopher F. Paragano that was filed

22     with the court on January 13, 2020.  I have a letter on the

23     stationery of the United States Attorney's office for the

24     Southern District of New York dated February 4, 2020, in the

25     nature of a sentencing memorandum from the government; and I

k2b2Ros1 kjc

1    have a very thick sentencing memorandum from Mr. Sapone and

2    Mr. Ruddy, together with about 20 letters of support, very warm

3    letters of support, plus information about the guidelines

4    sentences, but a number of very warm letters of support for

5    Mr. Rosa from family and friends, and I see many of them are

6    here with us today.

7              Is there anything else I should have seen in writing

8    prior to today's proceedings from the government?

9              MR. GENTILE:  No, your Honor.

10             THE COURT:  From the defendant?

11             MR. SAPONE:  No, your Honor.

12             THE COURT:  Has the government reviewed the

13   presentence report?

14             MR. GENTILE:  Yes, it has, Judge.

15             THE COURT:  Any additions, deletions, or corrections?

16             MR. GENTILE:  No, your Honor.

17             THE COURT:  So I will hear the government on

18   sentencing.

19             MR. GENTILE:  Thank you, Judge.  As noted in our

20   submission, the government believes that a sentence within the

21   stipulated guidelines range of 168 to 210 months' imprisonment

22   is sufficient, but not --

23             THE COURT:  Can I ask you a question about this?

24             MR. GENTILE:  Certainly, Judge.

25             THE COURT:  If that was going to be your position, why

k2b2Ros1 kjc

1    did you bother to let him plead to a lesser included?  You tell

2    me that you did this wonderful thing by relieving him of the

3    ten-year mandatory minimum, and now you are arguing for a

4    14-year sentence at the minimum.  I don't understand what the

5    benefit was of getting a plea to a (b)(1)(C) if we were going

6    to argue for a sentence that is four years above the mandatory

7    minimum for a (b)(1)(B).

8                MR. GENTILE:  Certainly, your Honor.

9                It is the government's position that, with the

10   guidelines the way they are structured, as opposed to the

11   mandatory minimum of five or ten years, it would afford the

12   defendant the opportunity to make his argument.  We believe

13   that the guidelines are appropriate, we believe that the --

14               THE COURT:  I think the guidelines are a mess and you

15   know that, Mr. Gentile, but this has to be the silliest, most

16   counterintuitive argument that the government has ever made.

17   In two consecutive sentences in your letter you say, We have

18   given him this marvelous opportunity to relieve him of the

19   mandatory minimum, now send him away for 14 to 18 years.

20               MR. GENTILE:  As your Honor knows, it is the U.S.

21   Attorney's office's position --

22               THE COURT:  -- that the guidelines are always

23   appropriate.

24               MR. GENTILE:  That's correct, your Honor.

25               THE COURT:  I know.

k2b2Ros1 kjc

1          MR. GENTILE:  But having considered the defendant's

2    conduct in the conspiracy, his role in the conspiracy, a

3    significant sentence is warranted here, Judge.

4          THE COURT:  I'm not denying that, but 168 months is

5    not a significant sentence, it's a Draconian sentence.

6          MR. GENTILE:  It is a significant sentence, and I will

7    leave it up to the court to determine how significant it is.

8          Our position recognizes the defendant's role in the

9    conspiracy as well as his offense conduct, Judge.  While he is

10   not a leader of the organization of which he was a member, his

11   role was not insignificant either.  The defendant was a

12   pitcher.

13         THE COURT:  He was a pitcher.  He was a

14   hand-to-hand --

15         MR. GENTILE:  He was a hand-to-hand guy.  He sold the

16   drugs that the organization sold to its customers.

17         THE COURT:  On the street.

18         MR. GENTILE:  Well, within the building that --

19         THE COURT:  "On the street" in this case means within

20   the building.

21         MR. GENTILE:  That's correct, your Honor, but he was

22   also -- at times he acted as a supervisor, a manager of the

23   lookouts who provided security for this building.  And as your

24   Honor is well aware, during the course of this investigation,

25   during the course of this case, this building has been a

k2b2Ros1  kjc

1   scourge of the neighborhood in upper Manhattan for many years.

2           THE COURT:  Indeed it has.

3           MR. GENTILE:  It has.  He acted as -- he positioned

4   these lookouts.  He paid them with money obtained from the DTO

5   that the DTO earned through its sales of heroin.  His position

6   within the DTO is further confirmed by the dozens of phone

7   calls that were intercepted by the government through court

8   authorized wiretaps in which the defendant can be heard and

9   recorded speaking about such things as customers getting sick

10  from the heroin the DTO was selling and that they were fainting

11  and kept falling.  Those are quotes, judge.  The volume of

12  business that the DTO was doing on specific days, he spoke

13  about taking -- he took instructions from supervisors, such as

14  his codefendant Victor Hidalgo, about how much heroin to give

15  other workers.  He discussed the poor quality of one specific

16  batch of heroin and that the customers were complaining, and he

17  himself complained about the conduct of other organization

18  members and how their conduct would get him arrested

19  eventually.  That's just a sample of some of the --

20          THE COURT:  How is it that that last kind of

21  conversation is indicative of his having a managerial type role

22  in the conspiracy?  I don't understand the logic of complaining

23  to Hidalgo:  These jerks out here are going to get me arrested.

24  How does that make him a manager?

25          MR. GENTILE:  I didn't mean to suggest that these

k2b2Ros1 kjc

1    conversations, these select conversations I'm offering as

2    examples --

3              THE COURT:  I'm assume you are offering the worst

4    ones, that you are not selecting the least troublesome ones.

5    You are trying to tell me about the worst ones.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2B8ROS2

1          MR. GENTILE:  But not for the sole purpose of showing

2     that he was a manager, Judge.  I am just trying to show you

3     what his involvement was.

4          THE COURT:  He was in.  They were all in.

5          MR. GENTILE:  So these are just a sample of the dozens

6     of conversations that were recorded.  In nearly every one of

7     the recorded conversations involving the defendant, he is

8     speaking about the DTO's operations, in some form or another.

9     And you're right, I provided the Court with the most

10    significant ones.  But as these conversations clearly show, the

11    defendant was fully aware that the fentanyl-laced heroin that

12    the organization was selling, that he was doing hand-to-hand

13    transactions with, was making its customers ill.  And despite

14    that fact, the defendant continued to sell this highly

15    dangerous and addictive drug.

16          With respect to his history and characteristics and

17    the need for adequate deterrence, both specific and general,

18    the defendant has 13 prior arrests, 11 convictions.  Almost all

19    of these arrests and convictions are, except one, for low-level

20    marijuana sale and possession offenses.  None of these offenses

21    resulted in any significant jail time.  So, clearly, Judge,

22    these noncustodial or minimal periods of incarceration did

23    nothing to deter him from reoffending or from engaging in more

24    serious conduct, the evidence of which is the offense for which

25    he is being sentenced today.

K2B8ROS2

1      The defendant's history is also indicative of his

2   general disregard for the law.  And that can also be seen in

3   the half a dozen or so bench warrants that were issued

4   throughout his criminal history where he failed to appear in

5   court as required by the state court, and also the defendant's

6   violation of his terms of release and at least one offense in

7   his criminal history.  For these reasons, your Honor, and for

8   those cited in our submission, the government feels that a

9   stipulated sentence within the stipulated guidelines range is

10  appropriate.

11      MR. SAPONE:  May I?

12      THE COURT:  You may.

13      MR. SAPONE:  So you know what your Honor is not going

14  to get from this table?  You are not going to get excuses.  You

15  are not going to get half-truths.  You are going to get the

16  truth.  And the truth is, how dare you, Ricky Rosa, think that

17  it was appropriate to do hand-to-hand sales from an apartment

18  building in Manhattan?

19      These folks that have come to court are not making

20  excuses for him.  It's too many to introduce, but we have his

21  mother, his girlfriend of 16 years.  They all wrote letters.

22  No one is for what Ricky Rosa did.  No excuses.  Wrong.  Bad

23  conduct.  How dare you?  How dare you?

24      The fact that Ricky Rosa is the sole person who brings

25  all these folks -- these fine folks, by the way -- and himself

K2B8ROS2

1   to this courtroom is not the end of it; it's the beginning.

2   Because our American criminal justice system, as your Honor

3   knows as chief judge of the courthouse, reflects certain values

4   of society, one of which is you don't sell drugs in the

5   community, another of which is redemption.

6          The government's argument in a nutshell is there were

7   overdoses, which is very sad and unfortunate.  It is not to be

8   soft-pedaled.  It's horrible.  One was fatal and we need to

9   have deterrence.  But I think we have to peel back the layers

10  of the onion on that argument.  This is going to be my

11  twentieth year defending in this building, really across the

12  street at 40 Foley, in the pre-*Booker* days, and I learned

13  something from then Judge Martin.  Judge Martin told me, as he

14  was handing out a 23-year sentence of an organizer or leader of

15  a DTO, the sentencing commission and Congress spends a lot of

16  time, or had spent in the 1980s a lot of time in their hearings

17  trying to figure this business out when promulgating the

18  guidelines.  And they talked about the guys on the top of the

19  DTOs -- the organizers, the leaders, the people who deserve

20  four-level enhancements; they drive fancy cars, they wear gold

21  Rolex watches, and they tote guns.

22         So I guess the point is, your Honor, is that, yes, we

23  have to send a message, and yes, this case is serious, but not

24  every single co-conspirator, not every single defendant on the

25  indictment has to be crushed by a sentence.  Certain sentences

K2B8ROS2

1        should be reserved for certain kinds of offenders.  This man is

2        a pee-on.  That's not to in any way minimize his role because

3        these DTOs would not exist without pee-ons.  But let's be clear

4        about what he is.  He is a pitcher.  He is given a few hundred

5        dollars to work a shift and to pitch hand-to-hands out of the

6        building.  He shouldn't have done it, but he is a pitcher.

7                The government and I do not want to wind up in a

8        Fatico hearing, but he did not get a four-level enhancement, or

9        a three-level enhancement, or even a two-level enhancement for

10       supervisory role because he is a pitcher.  He was told what to

11       do.  He took instructions.  Did it happen on occasion where one

12       of the mid-level managers would approach him and say, go and do

13       this or go and say that?  Yes.  He is not the only pitcher who

14       received such instruction from managers.

15                THE COURT:  I would be shocked if he were.

16                MR. SAPONE:  It doesn't make him a special person.

17                Was the heroin laced with fentanyl?  Sadly, it was.

18       But I remember 20 years ago it wasn't like this.  It seems to

19       me that every single one of these cases -- and it's a pleasure

20       to be on the panel as of six years ago because I get to meet

21       wonderful people like these -- we didn't have these fentanyl

22       situations, but every case is like that now.  There is nothing

23       special about it, as sad as it is.  That is just what it is.

24       Heroin is a dangerous business.

25                So probation says, throw the guidelines to the side,

K2B8ROS2

draconian -- I am paraphrasing -- unreasonable, not sufficient but not greater than necessary.  In fact, much more greater than necessary.  They suggest five years; I suggest three.  We are pretty close.

So let's get to his history and characteristics.  The worst childhood?  No.  His mother did a wonderful job.  His close-knit family did a wonderful job.  It takes a village to raise a child.  A ton of emotional trauma?  Yes.  Not nice that his father left the family, left the children and shacked up nearby and started a new family, and didn't send any money and didn't come and spend time with his boy.  Not nice.  But there is always redemption maybe for family situations too.

As he was growing up as a child, he hated himself, and he didn't want to do well, he didn't think he deserved it.  So although Ricky Rosa was an All-Star basketball player and was lucky enough to get a scholarship, he blew it.  He couldn't play basketball because he was angry.  He looked in the mirror and didn't like what he saw.  He didn't deserve to be successful.  Because mom was ultra successful, but to her credit, worked all the time and just wasn't home.  He didn't have a male role model.  He had knuckleheads on the street corner talking about the easy life and, unfortunately, that's the path he chose, as he was self-medicating so that he didn't have to feel the bad feelings he felt.  He was sad and he was pathetic.  Yes, he is 34 years of age, but he is immature

1    still.  He still has a lot to learn.  He never really grew up.

2          I juxtapose him with Mr. Garcia, who they look very

3    similar.  Mr. Garcia I believe got a seven-year sentence.  They

4    look very similar because they each have the same guidelines

5    calculation.  They each have the same criminal history

6    category.  They even both have 13 arrests.  It's strikingly

7    similar on the surface.  But as we peel back the layers of that

8    onion, we see that they are not the same, because Mr. Garcia --

9    and I don't mean to put anyone down, the man was sentenced

10   already -- was 62.  So almost, give or take a bunch of years,

11   double this man's age.  He had more time to get it right and he

12   didn't.  He still has a chance, Ricky Rosa, to pick up the

13   ashes and move on.  And he has three children, 14, 12 and 5,

14   two beautiful daughters who are in court and a little boy who

15   it wasn't appropriate to bring him to court.  Can Ricky Rosa

16   redeem himself and be a father to those three children?  Well,

17   I have got about 15 people here shaking their head.  They think

18   so.

19          We know, and this lawyer knows, these years are very

20   formative, very sensitive to be a child of 14, 12 and 5.  Was

21   he the best father in the world?  He is not getting any awards,

22   because he spent more than the last year in the MCC and not

23   home where he belongs.  Not the father of the year, but the

24   letters attest to a man who loves his children, a man who wants

25   to redeem himself and get home and work and pay taxes and give

K2B8ROS2

Erica money and raise those children so that they don't have to feel the feelings that Ricky Rosa felt when he was a five-year-old little boy, and when he was 12 and he was 14.

I am asking for an opportunity of redemption so that a 34-year-old man, with a mentality of someone much younger because he never grew up, can have a chance to be a father. And finally, after 13 state court arrests, five of which were expunged because the marijuana laws called for it, and sealed, he finally gets it right, because federal court is a place where one could look around and say, You ain't in Kansas anymore.  And thank you, Mr. Gentile, for the (b)(1)(C) offer because otherwise he would be stuck and your Honor would be stuck with a ten-year mandatory minimum.  And then everyone would be crying more than they are now.  So, yes, there is some grace here, and we appreciate what the government did in that vein.

So that man, Mr. Garcia, didn't learn.  Yes, he had some health issues, and I think his girlfriend had died; very sad, I don't say it lightly.  But he went to jail for 108 months and that didn't teach him.  And four months before this federal conspiracy case he got popped by the state for heroin sales, I think, and that didn't teach him.

Ricky Rosa's history is a bit different.  His criminal history involves all one-pointers, which caps out at four criminal history points and a CHC III.  It's a different

K2B8ROS2

1   history.  They are all marijuana related, drug related, because

2   he was using at the time.  We have a trespass, but you and I

3   have enough experience to know what that means.  It means

4   you're in a place you shouldn't be selling.  So you're

5   trespassing.  It's drug related.  It's marijuana related.

6   That's the big difference.

7          And so I say we have a need to avoid disparity in

8   sentences and Garcia got a seven-year sentence.  I know this is

9   an imperfect analysis at best, but if that man got a seven-year

10  sentence, we are asking for a much different one because the

11  circumstances are much different I think.  And what gets me,

12  what sticks in my craw is the 108-month sentence that didn't do

13  the trick and the four-month prior drug arrest in the state

14  that didn't do the trick.  He got nailed in the feds

15  notwithstanding.  It's a much different defendant, I argue.

16         So, your Honor, we say it's a wake-up call because one

17  thing that I am thinking that you're thinking is, yes, Mr. Rosa

18  has a wonderful support mechanism.  This is amazing.  There is

19  a whole village in this courtroom.  But he knew these people

20  when he was pitching, and they couldn't help him back then.

21  These are the arguments that we are well aware of by now.  But

22  this is a wake-up call for everybody.  There is some redemption

23  for them, too, because they could see the signs and they didn't

24  do anything about it.  Is it their fault?  Not at all, not at

25  all their fault.  But you know what?  Things are going to be

K2B8ROS2

1    done differently when Ricky Rosa gets back home, and that's

2    clear by the letters.

3          Erica Cabrera, if you would allow her a couple of

4    minutes, would like to speak to your Honor, because what she

5    said to me that she wants to say to you is that she sees a

6    profound change in Ricky Rosa.  She is allowed to see him once

7    a week and she goes every single time, doesn't miss, unless one

8    of the kids is spiking a fever.  And she sees a tremendous

9    difference in his affect, in his demeanor, in what comes out of

10   his mouth, and the fact that he already has a plan, if he gets

11   the few-year sentence that I am asking for, to be a porter of a

12   building.  Well, that's ironic.  At one point he is pitching

13   out of a building and now he wants to be a porter of a

14   building.  But you know what, we can take the bad in this

15   criminal justice and we can make it good.  He did a bad thing

16   in a building and he plans on doing a very good thing.  He is

17   going to clean up in a building, and I think that's wonderful

18   if he could actually land that job through his brother-in-law.

19         I look at the kinds of sentences available.  We can do

20   a lot on supervised release here, because maybe he should

21   finally get the help he never got for the bad feelings that he

22   grew up with as a child.  Because one thing this lawyer knows

23   is that when people come to my office, they have substance

24   abuse issues by and large, and they hate themselves, and then

25   they wind up making the terrible mistakes that land them in

K2B8ROS2

1    court.  That's usually what it is.  Never got the right help.

2    Now he will have a chance to do that.  The kinds of sentences

3    available.

4          I think the probation department is wonderful in what

5    they can do to help people turn around.  One way to look at it

6    is to say, forget about all these people, forget about the

7    concept of redemption, and let's just stick him in jail for 168

8    months.  That's one way to approach sentencing.  But there is

9    another way, and that way is a softer, gentler, kinder way.

10   And that is, he may not be a high-powered guy who comes in here

11   in some big fancy white collar case; he is the bottom of the

12   barrel, the drug cases, but he is no less valuable, and there

13   is no less potential for a good future.  He is only 34.

14         So, your Honor, I want to end with this.  We have to

15   promote respect for the law, and we have to sufficiently punish

16   people at sentencing.  And sometimes throwing the book at

17   defendants is appropriate; they are not going to get it unless

18   that happens.  Well, the longest sentence this man has ever

19   served is not nine years or any fraction of it; it's ten days

20   waiting on Rikers Island in the state court system.  So it's

21   1,085 days less than what I am proposing in the three-year

22   sentence.  It's literally 100 times less than what I am

23   proposing.  I am proposing a sentence 100 times greater than he

24   has ever faced before, and maybe that will do the trick.

25         Erica says the last year did the trick, that she wants

K2B8ROS2

1  him to come home now, and I wouldn't put that in my sentence

2  memo and wouldn't ask you for it; it's unreasonable, a year or

3  so is unreasonable.  I don't think 36 months is a slap on the

4  wrist for someone who has never suffered a prison sentence.

5  When we talk about general deterrence, it's not the length of

6  the sentence that deters, it's the certainty.  And any pitcher

7  on the block in Washington Heights who finds out about this

8  case, and no matter how thick the sentence memo was and how

9  voluminous and numerous the letters, Ricky Rosa still went to

10 prison for years and years, no one is going to sign up for that

11 pitching job, whether it's three years or four years or five.

12 It's the certainty.

13          THE COURT:  Well, OK.

14          MR. SAPONE:  To make a few hundred dollars per

15 shift --

16          THE COURT:  In this line of work, I find that general

17 deterrence is not a particularly salient concept.  There will

18 always be somebody who will sign up.

19          MR. SAPONE:  But it wouldn't be because your sentence

20 is --

21          THE COURT:  Correct.  They won't give a rat about my

22 sentence.

23          MR. SAPONE:  Enough said on that.  I want to end with,

24 we have to promote respect for the law and sometimes a

25 heavy-handed sentence does it.  The community looks at the

K2B8ROS2

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | sentence and respects it.  Other times promoting respect for         |
| 2  | the law is leniency and given the chance at redemption, and           |
| 3  | then a community of people respect that even more.                    |
| 4  | Thank you for listening to me and reading my papers.                  |
| 5  | THE COURT:  Thank you, Mr. Sapone.                                    |
| 6  | Mr. Gentile, anything else you want to say?                           |
| 7  | MR. GENTILE:  Your Honor, the only other thing I would               |
| 8  | add is that throughout the course of the defendant's fairly           |
| 9  | extensive criminal history, he has been afforded leniency in          |
| 10 | almost every sentence he has received.  That's by the                 |
| 11 | defendant's own admission just now.  He has not received a            |
| 12 | significant sentence.                                                 |
| 13 | THE COURT:  Oh, he is going to get a significant                      |
| 14 | sentence.                                                             |
| 15 | MR. GENTILE:  I will leave it at that, Judge.                        |
| 16 | MR. SAPONE:  Can Erica Cabrera say a few words?                      |
| 17 | THE COURT:  If she must.                                              |
| 18 | MR. SAPONE:  Keep it short.                                           |
| 19 | THE COURT:  I have read your letter, ma'am.                           |
| 20 | MS. CABRERA:  Yes.  What I would like to say is, over                |
| 21 | the past year and couple of months Ricky has been gone, it has        |
| 22 | been a big strain on the family.  I have two daughters, one is        |
| 23 | suffering from anxiety.  My five-year-old son has separation          |
| 24 | anxiety.  I can't tell him I am going to work because he               |
| 25 | screams and cries and he wants his father.                            |

K2B8ROS2

1          What I can say is just from what I know.  Ricky, I

2     know him for 16 years and probably better than anyone else.  I

3     really feel like, because of the children, Ricky is going to

4     straighten up.  And he did have children before this, but he

5     has never been to prison before, not to this extent.  We have

6     never been away from each other more than a day either.  And

7     his mother, he wants to come and take care of her as well, and

8     like he said, redeem himself.

9          Thank you.

10          THE COURT:  Thank you for coming down today.

11          Mr. Rosa, do you have anything you want to say to me

12     before I sentence you?

13          THE DEFENDANT:  Yes, your Honor.

14          I just want to say that I am truly, truly sorry.  I

15     apologize.  And with all my heart, I really truly, truly regret

16     everything that I have done.  My beautiful mother raised me

17     with great moral and dignity, and she taught me what is right

18     and what is wrong.  She is a beautiful soul, which I believe

19     she has passed that to me.  I definitely and can't deny that

20     the act I partook in was bad and disgusting, but in all

21     reality -- I am tremendously nervous now.

22          THE COURT:  That's OK.

23          THE DEFENDANT:  I don't make any excuses or anything

24     like that.  I understand what I did.  I was hurting my

25     community and destroying my community, a beautiful community

K2B8ROS2

which I was raised in.  And through you and the Lord, I just

want to honestly apologize to the people, kids and family, that

I selfishly affected.  I selfishly was only worried about my

gains and needs, and for that I truly want to apologize to my

babies, my wife and my mom, because I was selfish, without

giving a thought to how much I was hurting them instead of

helping by all my bad decisions.  It hurts like hell.  There is

literally no words that can explain my hurt and pain for taking

myself away from my kids and my wife.

          I just want to let you know, your Honor, that I truly

regret everything that I have done.  This has been beyond a

lesson learned.  I will never, ever, ever break the law ever

again in my life.  I will never do anything to take myself away

from my kids.  I truly would never break the law so much that I

won't even jaywalk on the street just to avoid any problem with

the law.  I will never, ever hurt my beautiful community

because I actually want to be a pillar to my community.  I have

a very close friend in basketball and tutors young kids that

are student athletes.  And I take my kids to this program with

my friends every weekend, and he always tells me, whenever

you're ready, Ricky, you have the opportunity to join us.  But

I never jumped on the opportunity, for obvious reasons.  I just

really want to help.  I truly just want to help.

          I had a lot of time in my hand while I was

incarcerated and all I think about is how can I help others and

K2B8ROS2

1  my family.  And with all the time I had away from them and not

2  being a part of society, I just really want -- I just really

3  want to be able to help and strive and show others that I have

4  learned my lesson, and I can teach kids in my community, and my

5  beautiful babies and my mom and my wife that I can strive in

6  life by pure hard work and dedication.  I completely understand

7  the nature of my case and the situation I am in, and I just

8  think, I truly believe that the Lord put me in this situation

9  because I will make the best of it and I will overcome it.

10          Thank you for listening to me and I appreciate it.

11          THE COURT:  Have a seat.

12          Let me start out by saying that the Lord did not put

13  you in this situation; you put you you in this situation.  I am

14  sure the Lord is not terribly pleased that you put yourself in

15  this situation, but that's all between you and the Lord.  What

16  is between you and me is sentencing.

17          Now, you were originally arrested on as serious a drug

18  felony as exists.  It was a (b)(1)(A) originally.  It was a

19  crime that had a ten-year mandatory minimum, which meant I

20  would have had no choice but to sentence you to at least ten

21  years, at least 120 months in prison; and that was because of

22  the amount of drugs that the organization had run through the

23  building.  And you, of course, weren't involved in the

24  distribution of all of those drugs, you were involved in the

25  distribution of a relatively small fraction of those drugs, but

1   you were part of an organization that was a scourge of a

2   building and that passed out a truly hideous quantity of drugs

3   to a lot of people, ruining a lot of lives, making them, as you

4   have never been because you weren't a heroin addict, physical

5   and economic slaves to the drug and the people who could supply

6   it.  And you knew that what you were doing was wrong, and you

7   did it for a long time.  And I think it is an incredibly

8   serious crime for which you have not nearly yet done enough

9   time.

10          I know how desperate your family is to have you home.

11  It breaks my heart to see your daughter cry.  It breaks my

12  heart that this woman, who has devoted her whole life to you,

13  and to your children, should have to come into this courthouse

14  and plead for you.  It breaks my heart that your mother, who

15  loved you and cared for you through adversity in her own life,

16  has to see you come to this.  But come to it you have, and you

17  have of your own free will.  And you will be appropriately

18  punished for a crime, the gravity of which I simply cannot

19  downplay.  I appreciate that you are not the individual

20  apparently who was responsible for distributing the heroin that

21  resulted in the death, but you knew it was bad stuff and you

22  kept on doing it anyway.  And it would not be appropriate,

23  given the nature and the circumstances of the crime, including

24  the fact that it terrorized an entire building, for you to go

25  home today.

K2B8ROS2

1          The government's position, however, strikes me as

2    utterly nonsensical.  If the government wanted you punished as

3    a (b)(1)(A), I don't understand why the government offered a

4    plea to a (b)(1)(C).  If you had pleaded to a (b)(1)(A), I

5    would be thinking seriously about a ten-year mandatory minimum

6    as opposed to this guideline.  The fact that the government

7    offered a (b)(1)(C) indicates to me that your position in the

8    hierarchy of this organization was way down toward the bottom,

9    and a 168-month sentence is utterly and completely inconsistent

10   with being way down toward the bottom of the hierarchy of this

11   organization.  It just is.  This is a case that cries out for a

12   non-guideline sentence, and since there is no mandatory

13   minimum, that guideline sentence should be somewhere below what

14   the mandatory minimum would have been.

15          I have great respect for and faith in my presentence

16   probation officers.  They do great work.  And they have thought

17   about your case in great detail, and they have concluded that

18   you're not as high up on the totem pole as the guy I gave 72

19   months to, who was 62 years old, and that it would be

20   appropriate to sentence you to a little bit less time than

21   that.  I think that's about right.  I think that probation's

22   recommendation of five years, which would have been the

23   mandatory minimum for the (b)(1)(B), is kind of spot on.  It's

24   the right amount of time for someone who was at your low level

25   in the organization, but who has your criminal history, but who

K2B8ROS2

1    has your extensive past.  You need to spend time in jail.  Your

2    family doesn't need it, your friends don't need it, but you

3    need it.  And society needs for you to do that too.

4             I am not concerned that if the word gets out on the

5    street in Washington Heights that people will think it's a walk

6    in the park to come to federal court on a drug charge.  I am

7    not concerned about that at all.  It is a significant sentence.

8    It's a greater sentence than this defendant has ever faced

9    before.  It is a greater sentence than many people face.  And

10   the fact is his state court drug crimes, given the number of

11   his state court drug crimes -- I was a state court judge; I

12   have some knowledge of how state court charging and sentencing

13   works -- his state court drug crimes are very, very petty

14   crimes if he never managed to get himself arrested on a felony

15   drug charge, which doesn't take a lot.  You don't have to sell

16   a lot in order to get charged with a B felony in the state

17   court, and the second time that happens you're looking at four

18   and a half to nine.

19            So you made a terrible mistake.  Your first big score

20   was in the wrong place and at the wrong time, at a time when

21   our fine U.S. Attorney's Office was looking hard and the FBI

22   and the DEA were looking hard at drug operations like the one

23   that you got involved with.  And you got caught and you will

24   pay.

25            I have reviewed the presentence report.  I accept and

K2B8ROS2

1    adopt as my findings its description of the offense and the

2    offense conduct.  Its calculation of the guidelines is correct.

3    The total offense level is 33, given that the defendant has

4    accepted responsibility for pretty much the entirety of the

5    drug operations in the building, but there is no question that

6    he was not himself responsible for even a large fraction of

7    that amount.

8         The defendant's criminal history is correctly

9    calculated.  The criminal history score is four points, because

10   we have a lot of arrests but a lot of no-point convictions, and

11   so the defendant is in Criminal History Category III.

12        I accept and adopt as my findings the offender

13   characteristics that are set forth beginning at paragraph 68 of

14   the presentence report.

15        I have read the letters that Mr. Sapone submitted.

16   They are very moving.  You are obviously, Mr. Rosa, someone who

17   has caused a lot of people to love you and to care about you,

18   and to want to help you, and some of them are sitting here

19   today.  You have messed up some of their lives pretty badly,

20   for which you will have to atone.  But I hope that that support

21   group of people will be around when you are released from

22   prison to help you get started in a more appropriate lifestyle,

23   in a more appropriate line of work.

24        I note that before Mr. Sapone, I suspect, gave you a

25   talking to, you were resistant about drug treatment.  And you

K2B8ROS2

1    are going to get drug treatment; you are going to get it

2    whether you want it or not.  And you need to understand my

3    attitude about people who are resistant to drug treatment or to

4    any condition that I set on them as part of their sentence.

5    You resist at your peril.  You resist at your peril.  Because

6    if they bring you back in front of me again, you will regret

7    it.

8            Would you please stand.

9            Under Docket No. 18 Cr. 802, total offense level 33,

10   criminal history category of III, I am taking the

11   recommendation of probation and imposing a variance sentence.

12   I hereby sentence you, Ricky Rosa, to be remanded to the

13   custody of the attorney general of the United States and Bureau

14   of Prisons for a term of 60 months, to be followed by a term of

15   five years' supervised release.  Four was recommended, five is

16   imposed.  There is no recommendation for a fine and I am not

17   imposing one.  The defendant has no ability to pay.

18   Restitution is not applicable.

19           Is the government seeking forfeiture from Mr. Rosa?

20           MR. GENTILE:  It is not.

21           THE COURT:  You are required to pay a special

22   assessment -- that's court costs -- of $100.  If you don't have

23   $100, it will be deducted from your prison wages at the rate of

24   $25 per calendar quarter or 50 percent of your gross monthly

25   earnings if you are in a UNICOR grade 1 through 4 work program,

1    which I hope you will be put in because that's a great place to

2    learn a skill that you can make use of when you get out.

3             Recommendation for place of incarceration, Mr. Sapone.

4             MR. SAPONE:  Yes.  We are looking at Fort Dix or

5    Danbury, if they have space.

6             THE COURT:  Certainly as close as possible to the New

7    York City metropolitan area.  Mr. Rosa has an unusually strong

8    family support system.  This is not a defendant who has nine

9    children by eight baby mommas.  This is a gentleman who is in a

10   long-term stable relationship with a woman, and they have three

11   children who they have raised together.  This is an intact

12   family unit here.  It is the best thing for this family if he

13   remain in the New York City metropolitan area so that his

14   family can remain in physical visual contact with him over the

15   course of his period of incarceration.  And it will also have

16   rehabilitative repercussions as well, I suspect, but I feel

17   particularly strongly in Mr. Rosa's case that the family

18   considerations warrant his staying here in the New York City

19   metropolitan area.

20            So, sir, when you get out of prison, you have to be on

21   supervised release for five years.  Supervised release is sort

22   of like being on probation in the state system, your being on

23   parole in the state system, except it's not because we are

24   really, really serious about it.  That means for five years you

25   have to report to a United States probation officer, whose

K2B8ROS2

1    office is located in this building.  And you have to do that on

2    a regular basis, and you have to do everything the probation

3    officer tells you to do, and you can't do anything the

4    probation officer tells you you can't do.  The probation

5    officer has pretty absolute authority over you, and you need to

6    understand that; and maybe you won't like it, but that doesn't

7    matter, you still have to do it.

8              You have to report to the probation office in this

9    building within 72 hours of your release from imprisonment.

10   After reporting to the office, you will receive instructions

11   for who your officer will be and how frequently you must

12   report.  And then you must report on that schedule, on that

13   basis, as instructed.

14             You are authorized to live in the Southern District of

15   New York, and you must not knowingly leave the Southern

16   District of New York without first getting permission from your

17   court or the probation officer.  You must answer truthfully all

18   questions put to you by the probation officer.  You must live

19   at a place approved by your probation officer.  One of the

20   things about that five years of supervised release is the

21   probation officer gets to decide whether you can live where you

22   want to live or not.  And if you are going to change anything

23   about your living arrangements -- the people you live with,

24   where you live, anything like that -- you have to notify the

25   probation officer at least ten days before making the change,

K2B8ROS2

1   because the probation officer has to have time to check things

2   out and decide whether he wants to veto them or not.

3          If there is an emergency, there is a fire in the

4   neighborhood, they make you evacuate your apartment, then you

5   have to call your probation officer within 72 hours and explain

6   where you are and why you're not where you're supposed to be.

7          You have to allow the probation officer to visit you

8   in your home at any time, or elsewhere, at work, and you have

9   to permit the probation officer to take any items that are

10  prohibited by the conditions of your supervision that he or she

11  observes in plain view.

12         You have to work at least 30 hours a week at a lawful

13  type of employment unless you're excused from doing so, which I

14  very much doubt you will be.  If you don't have full-time

15  employment, you have to try and find it.  Usually the only

16  reason we excuse people is if they are full time in school.

17         If you plan to change where you work or anything about

18  your position or your job responsibilities, you have to tell

19  your probation officer ten days before making that change,

20  because the probation officer can for those five years decide

21  that's not a job that's appropriate for you, that's not a place

22  where it would be useful for you to work.  Again, if notifying

23  the probation officer at least ten days in advance is not

24  possible, if the business closes down so you no longer have a

25  job, you have three days, 72 hours, to notify your probation

K2B8ROS2

1   officer.

2          Now, all of those things are about the conditions of

3   your life.

4          You may not commit another crime -- federal, state,

5   local.  I don't care if it's a felony or a misdemeanor or a

6   violation, you may not commit another crime.  If you commit

7   another crime, whatever court is in charge of that crime will

8   punish you for committing that crime.  I will then punish you

9   for violating the terms of your supervised release.  And that's

10  two punishments and they won't be concurrent.

11         You must not unlawfully possess any controlled

12  substance.

13         You must refrain from the unlawful use of controlled

14  substances.

15         And that will include your participation in an

16  outpatient treatment program approved by the United States

17  probation office, which will include testing to determine

18  whether you have reverted to using controlled substances.  By

19  the way, marijuana is a controlled substance.

20         You must contribute to the costs of services rendered

21  based on your ability to pay or the availability of third-party

22  payment.

23         I authorize the release of available drug treatment

24  evaluations and reports, including the presentence

25  investigation report, to your substance abuse treatment

K2B8ROS2

1    provider.

2              I am also directing that you participate in a mental

3    health program, which is not what was recommended by probation,

4    but it's recommended by me, under the same terms and conditions

5    as the substance abuse program.

6              And if you don't participate in these programs, sir,

7    if you rebel, if you decide this is not what you want to do and

8    you don't go to the sessions and you don't cooperate, you will

9    be violated.  They will violate the terms of your supervised

10   release, and we will haul you right back in front of me and we

11   will decide whether, since you don't want to do what I tell you

12   to do, you wouldn't be better off in jail again.

13             You have to cooperate in the collection of DNA,

14   genetic identifying material, as directed by your probation

15   officer.

16             You may not communicate or interact with someone who

17   you know is engaged in criminal activity.  If you know someone

18   who has been convicted of a felony, and obviously you do know

19   quite a few people who have been convicted of a felony, you may

20   not knowingly communicate or interact with that person without

21   first getting the permission of your probation officer.  The

22   permission may or may not be forthcoming.  Fortunately for you,

23   you have a large group of people who have not been convicted of

24   felonies who really want to be part of your life.

25             If you are arrested or if you are questioned by any

law enforcement officer, you must notify your probation officer

within 72 hours.  You must notify your probation officer within

72 hours.

        You must not own, possess, or have access to a

firearm, ammunition, any destructive device or dangerous

weapon.

        You must not act or make any agreement with a law

enforcement agency to act as a confidential human source or as

an informant without first getting the permission of the Court.

        And as a general rule, you must follow all of the

instructions of your probation officer.

        Now, one more thing.  You shall submit your person and

any property, residence, vehicle, papers, computer, other

electronic communication or data storage devices, Cloud storage

or media, and your personal effects to a search if your

probation officer has reasonable suspicion that you have

committed a violation of the conditions of your supervision or

some form of unlawful conduct.  And the probation officer may

be assisted in carrying out that search by law enforcement

agents.

        Such search is to be conducted at a reasonable time

and in a reasonable manner.  But your failure to submit to

search will be grounds for revocation of your supervised

release.  And you need to warn the people that you live with

that if your probation officer thinks you're in trouble, the

K2B8ROS2

| | |
|---|---|
| 1 | probation officer can come in and search.  And by the way, I |
| 2 | just signed the warrant.  What I just said is the warrant. |
| 3 | There doesn't need to be any other warrant. |
| 4 | OK.  You can have a seat. |
| 5 | I assume that the defendant waived his right to appeal |
| 6 | from that sentence. |
| 7 | MR. SAPONE:  Yes.  It's a standard plea agreement, |
| 8 | your Honor. |
| 9 | When you have a moment to give me a moment, I would |
| 10 | like to say one other thing. |
| 11 | THE COURT:  Say anything you want. |
| 12 | MR. SAPONE:  I don't think we should wait until Ricky |
| 13 | Rosa is released to get drug rehab.  I think the residential |
| 14 | drug and alcohol program within -- |
| 15 | THE COURT:  I am not recommending him for the 500-hour |
| 16 | program. |
| 17 | MR. SAPONE:  Does that suggest that if the BOP -- |
| 18 | THE COURT:  If the BOP thinks he should get it, the |
| 19 | BOP should give it to him.  The BOP should give Mr. Rosa any |
| 20 | drug treatment option that it thinks will be beneficial to Mr. |
| 21 | Rosa, but that's the BOP's decision in this case, not mine.  It |
| 22 | didn't sound like Mr. Rosa wanted much help, but maybe he has |
| 23 | come to his senses. |
| 24 | MR. SAPONE:  He has, your Honor.  Thank you. |
| 25 | THE COURT:  Mr. Rosa, do you recall that at the time |

K2B8ROS2

1     you pled guilty you also signed a letter of agreement with the

2     government?

3               THE DEFENDANT:  Yes.

4               THE COURT:  Do you recall that in that letter it said

5     that if I sentenced you to 210 months or less in prison, you

6     would not take an appeal from your sentence or file a lawsuit

7     alleging that your sentence was illegal?

8               THE DEFENDANT:  Yes.

9               THE COURT:  And did Mr. Sapone explain to you at the

10    time you signed the letter that by signing that letter, you

11    were giving up a right, that you had a right to take an appeal

12    from your sentence as long as your sentence wasn't too high?

13              THE DEFENDANT:  Yeah.

14              THE COURT:  And did you sign the letter of your own

15    free will?

16              THE DEFENDANT:  Yeah.

17              THE COURT:  Did anyone threaten you or coerce you or

18    exert any kind of improper pressure in order to get you to sign

19    that letter?

20              THE DEFENDANT:  No.

21              THE COURT:  OK.  I have sentenced you to 60 months.  I

22    think we can agree that 60 months is less than 210 months,

23    right?

24              THE DEFENDANT:  Yeah.

25              THE COURT:  So it's my understanding that you have

K2B8ROS2

| | |
|---|---|
| 1 | waived your right to appeal.  Is that also your understanding? |
| 2 | THE DEFENDANT:  Yes. |
| 3 | THE COURT:  Because I didn't sentence you to 168 |
| 4 | months, the government technically has the right to take an |
| 5 | appeal from your sentence if it believes the sentence to be |
| 6 | unreasonable.  If the government were to file an appeal from |
| 7 | your sentence, you would have the right to counsel, the right |
| 8 | to have a lawyer appointed for you if you did not have the |
| 9 | money to hire a lawyer. |
| 10 | Do you understand that? |
| 11 | THE DEFENDANT:  Yeah. |
| 12 | THE COURT:  Fine. |
| 13 | MR. SAPONE:  One last thing.  May I? |
| 14 | THE COURT:  Yes, Mr. Sapone. |
| 15 | MR. SAPONE:  So I think that when people do something |
| 16 | nice for someone, they should thank those people.  Could he |
| 17 | address the folks that came out and supported him? |
| 18 | THE COURT:  I wish he would.  I am not the person he |
| 19 | needs to apologize to. |
| 20 | MR. SAPONE:  Can he turn around? |
| 21 | THE COURT:  Yes. |
| 22 | THE DEFENDANT:  I thank you.  I love you for coming. |
| 23 | I wish I had more time to speak to you.  I love you, baby. |
| 24 | THE COURT:  OK. |
| 25 | MR. SAPONE:  Thank you, your Honor. |

K2B8ROS2

1           THE COURT:  All right.  Anything else from the

2   government?

3           MR. GENTILE:  No, your Honor.

4           THE COURT:  From the defendant.

5           MR. SAPONE:  No.  Thank you, your Honor.

6           THE COURT:  These proceedings are closed.

7           (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25