

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 8, 2021

**BY ECF**

Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street, Room 2550
New York, New York 10007

  Re: *United States v. Pedro Vicioso De Lima*, 18 Cr. 802 (CM)

Dear Judge McMahon:

  The defendant in the above-captioned case is scheduled to be sentenced by Your Honor on July 15, 2021 at 10:00 a.m. The Government writes in advance of sentencing. Pursuant to a plea agreement between the parties, the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") stipulated range is 235 to 293 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons set forth below, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 235 to 293 months' imprisonment is appropriate.

  **A. Offense Conduct**

  On October 31, 2018, the defendant was charged in a single count indictment. Count One charged the defendant with participating in a conspiracy to distribute and possess with intent to distribute one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

  The charge arose from the defendant's membership in a drug trafficking organization ("DTO") engaged in the sale of street level amounts of heroin out of a building located in upper Manhattan (the "Drug Building"). (Presentence Investigation Report ¶ 9) ("PSR"). Much of the heroin the DTO sold was laced with fentanyl. (PSR ¶ 9). In order to assure its customers that the heroin they purchased from Drug Building belonged to the DTO, the DTO placed stamps on the glassines of heroin as a way to identify it as a DTO product. (PSR ¶ 10). Because of the potency of the heroin it sold and its mixture with fentanyl, glassines marked with the DTO's stamps were recovered at the scene of multiple fatal and nonfatal overdoses of individuals who were believed to be customers of the DTO. (PSR ¶ 11). Rather than attempting to alter its formula for packaging the heroin it sold, the DTO embraced its reputation for selling a product so potent that it had the potential to kill its customers. (PSR ¶ 13).

As with any organization, each member played a different role in the DTO's organizational hierarchy. (PSR ¶ 14). The defendant was the leader and head of the DTO (PSR ¶¶ 14, 18), and controlled and oversaw the DTO's operations. Vicioso de Lima was generally offsite directing co-conspirators over the phone and checking in with managers, but was not engaged in specific deliveries of narcotics. (PSR ¶ 18).

Vicioso de Lima's role as a leader of the DTO was established, among other things, by a judicially authorized wiretap of phones used by Vicioso de Lima and other members of the DTO, including the DTO's second-in-command Victor Hidalgo, which revealed the defendant discussing numerous aspects of the DTO, including the quantity of drugs that had been sold by the DTO, lookouts working for the DTO, and complaints by customers about the quality of the drugs being sold by the DTO. (PSR ¶ 19).

As just one example, on April 22, 2018, an intercepted phone call between the defendant and Hidalgo revealed the defendant instructing Hidalgo to "give me back that stuff. So then I could give that shit to the people. You heard? . . . [M]ore or less. How much did you guys take? For me to know what to tell them." Hidalgo responded: "Like one something. Like a hundred something. Around there." The investigation revealed that the conversation was related to the drug supply that Hidalgo was handling on behalf of the DTO. Vicioso de Lima was instructing Hidalgo to weigh and return the drug supply so that Vicioso de Lima could give back the narcotics to a third party, apparently based on customer complaints discussed in other intercepted calls about the strength of the drugs being sold by the DTO. (PSR ¶ 20).

The investigation further revealed that the defendant was made aware that people were becoming sick and overdosing on the drugs being sold by the DTO. On May 15, 2018, the defendant and co-defendant David Perez discussed lookouts at the Drug Building and the apparent overdoses. In the course of that conversation, Perez told the defendant that "three people have dropped" and the defendant responded, "Three people dropped?" Perez later stated "[S]omeone is doing something," to which Vicioso de Lima stated, "Yes, but I'll explain it to you later. You know what they are doing?," and Perez stated "The liga [mixture]." The defendant responded "Yes, that's what they are doing. Is not that, that is making them like that." (PSR ¶ 21). The investigation also established that the defendant was associated with at least two stash houses used by the DTO, as detailed below.

The first of these stash houses ("Stash House-1") was an apartment located a short distance from the Drug Building that was used exclusively to store drugs and other materials used by the DTO. Stash House-1 was frequented regularly by the defendant; based on law enforcement surveillance, it was determined that the defendant and Hidalgo had sole access to Stash House-1. When searched by law enforcement, Stash House-1 was found to contain heroin with a "Family Guy" stamp that the victim of a non-fatal overdose reported was obtained from the Drug Building. (PSR ¶¶ 28-33).

The second stash house ("Stash House-2') was leased in the name of co-defendant Mayra Monsanto and was used by the DTO to store drugs, drug proceeds, and radios used by members of the DTO to communicate with one another. Stash House-2 was located in a building that shared a rooftop with the Drug Building and that the members of the DTO would access during their shifts

to obtain additional drug supply or to drop off drug proceeds, and to hide from law enforcement. (PSR ¶¶ 34-39).

Additionally, during the course of a pending criminal matter in New Jersey, the defendant provided the Government with copies of hundreds of invoices claiming they were associated with businesses located at the Drug Building. (PSR ¶ 22).

### B. The Presentence Report

On March 6, 2020, the Probation Department issued the PSR and determined that the defendant's applicable base offense level, under Chapter Three of the Sentencing Guidelines, is 36. (PSR ¶ 68). The PSR added two levels for the defendant's maintenance of a premises (Stash House-1 and Stash House-2) for the purpose of distributing a controlled substance, and an additional three levels for being a manager or supervisor of the DTO, for an adjusted offense level of 41. (PSR ¶¶ 69, 71). The PSR also subtracted three levels, under U.S.S.G. § 3E1.1(a), for acceptance of responsibility, resulting in a total offense level of 38. (PSR ¶¶ 75-77). As a result, the PSR calculated the applicable Guidelines range as 235 to 293 months' imprisonment. (PSR ¶ 118).

The PSR identified no factors that would warrant a departure from the applicable Guidelines range (PSR ¶ 134), and correctly observed that the defendant is ineligible for probation because the offense is a Class B felony, citing U.S.S.G. § 5B1.1(b)(1). (PSR ¶ 123).

### C. Discussion

#### 1. Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to provide restitution to victims. *Id.* at 50 & n.6.

#### 2. A Sentence Within the Stipulated Guidelines Range Is Appropriate in this Case

The Government respectfully submits that a sentence within the applicable Guidelines range of 235 to 293 months is appropriate under the particular circumstances of this case. The Government submits that such a sentence is appropriate in light of the need for the sentence imposed to (i) reflect the seriousness of the offense, promote respect for the law, and provide just

punishment (ii) to afford adequate deterrence; and (iii) account for the history and characteristics of the defendant.

      To begin with, this was a serious offense, and the defendant's punishment should reflect that fact. The defendant was the leader and head in a prolific and long running drug-trafficking organization that, in less than one and a half years, distributed approximately 85 kilograms of fentanyl laced heroin worth over $12,000,000. (PSR ¶ 17). The defendant was the highest-ranking member of the DTO. He controlled and oversaw the operations of the DTO, and together with Hidalgo managed the stash houses both adjacent to and apart from the Drug Building, where the DTO stored its wares. Although the defendant does not have any prior criminal convictions, the defendant's criminal conduct was longstanding and the most culpable of all defendants in this case. The defendant's conduct was not only serious, but by design was difficult for law enforcement to detect. The defendant led the DTO almost entirely remotely, rarely being seen or present near the Drug Building and coordinating the DTO's operations through his trusted conspirator, Hidalgo. Despite his physical distance from the DTO's drug trafficking operations, the defendant was intimately involved with the inner workings of his organization. As evidenced by intercepted phone communications, the defendant directed Hidalgo on a number of matters including how to handle drugs being sold by the DTO, directing lookouts working for the DTO, and handling complaints by customers about the quality of drugs being sold by the DTO. (PSR ¶¶ 19, 20.) But for these intercepted communications, the level and extent of the defendant's participation in the DTO may never have come to light. And without the defendant's leadership of the DTO and its members, the DTO would not have functioned as successfully and efficiently as it did.

      Moreover, the defendant knew that he was trafficking in highly dangerous drugs that were having a serious impact on the community. As the Court is well aware, heroin is a highly addictive, dangerous, and potentially deadly drug even when not laced with fentanyl. *See, e.g.*, Marco Sanger-Katz, Bleak Estimates in Drug Epidemic: A Record 72,000 Overdoes Deaths in 2017, The N.Y. Times, Aug. 15, 2018 (noting that heroin overdose deaths exceeded 15,000 in 2017); Joel Achenbach, Fentanyl Drug Overdose Deaths Rising Most Sharply Among African Americans, Washington Post, Mar. 21, 2019 (noting that the death rate among African Americans from fentanyl-involved drug overdoses rose 141 percent each year, on average, from 2011 to 2016); Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/data/heroin.html (last visited Sept. 5, 2019) (noting that heroin related overdose deaths increased five-fold from 2010 to 2017).

      Here, the drugs sold by the DTO have been connected to multiple fatal and nonfatal suspected overdoses of individuals believed to be customers of the DTO—who had purchased glassines marked with the DTO's distinctive stamps. (PSR ¶¶ 11-13). As evidenced by further intercepted communications between Hidalgo and the defendant, the defendant was informed no later than May 2018 that the mixture of heroin being sold by the DTO was causing people to "drop[]"—i.e. overdose—outside the Drug Building. (PSR ¶ 21.) Nevertheless, the defendant persisted in leading the DTO and selling its potentially fatal narcotics through his arrest in this case in November 2018. As such, the defendant knowingly directed a sprawling organization that posed significant harm to society at large and his criminal conduct is deserving of a significant sentence.

As the PSR noted, the defendant's conduct has presented an extreme danger to the community through his participation in the distribution of such a highly addictive and dangerous drug. (PSR at 30-31). *See United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'"). Further, contrary to claims made in his sentencing submission, the defendant's prior arrest and seizure of hundreds of thousands of dollars establish that he profited significantly from his crimes and is a longtime offender who has been undeterred by prior interactions with law enforcement. As the PSR describes, the defendant was arrested in May 2015 in New Jersey and charged with money laundering after he was found with more than $667,000 in unaccounted U.S. currency; he has no verified employment that would explain his possession of such significant amounts of cash, which appear to be the proceeds of his drug trafficking. (PSR at 30). The defense ignores this fact when it claims in its submission that there is no evidence that the defendant profited from his crimes. Indeed, in connection with his New Jersey case, the defendant provided the Government with copies of hundreds of falsified invoices claiming they were associated with businesses located at the address of the Drug Building—a residential building where the DTO's operations, not any legitimate business of the defendant, were conducted. (PSR at 30.) His 2015 arrest did not deter his currently charged criminal conduct. (PSR at 30.)

The defendant's age and health conditions also do not warrant a significant variance here. The defendant has not argued or demonstrated that his health conditions cannot be adequately addressed by the BOP. And just three years ago, the defendant's age did not prevent the defendant from serving as the leader and head of the DTO. While the Government is sympathetic with the fact that the defendant contracted COVID-19 while incarcerated and has as a result of his criminal activity been separated from his family, his conditions of confinement simply do not outweigh the need for a Guidelines sentence to address the seriousness of his crime in light of the impact of his conduct on the community and given his personal history.

Thus, a sentence within the applicable Guidelines of 235 to 293 months' imprisonment is warranted by the defendant's leadership of the DTO, the seriousness of the drugs dealt by the DTO and the resulting harm to the community, and the defendant's failure to be deterred following a prior arrest and charge for money laundering.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 235 to 293 months' imprisonment, as such a

sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

        Respectfully submitted,

        AUDREY STRAUSS
        United States Attorney

By:   /s/
        Jessica Greenwood/Aline Flodr/Dominic A. Gentile
        Assistant United States Attorneys
        (212) 637-1090/1110/2567

cc: Anthony L. Ricco, Esq. (via ECF)